UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------X
                                       :
MARIO OSORIO,                          :
                    Plaintiff,         :
                                       :      04 Civ. 7515(DLC)
         -v-                           :
                                       :      OPINION & ORDER
JO ANNE BARNHART, Commissioner of      :
Social Security,                       :
                                       :
                    Defendant.         :
                                       :
---------------------------------------X

Appearances:

For Plaintiff:
Christopher James Bowes
Center for Disability Advocacy Rights
("CeDAR"), Inc.
841 Broadway, Suite 605
New York, NY 10003

For Defendant:
Susan D. Baird
Assistant United States Attorney
United States Attorney's Office for the
Southern District of New York
86 Chambers Street, 3d Floor
New York, NY 10007

DENISE COTE, District Judge:

     Plaintiff Mario Osorio filed this action seeking review of a
final decision by the Commissioner of Social Security (the
"Commissioner") denying his application for supplemental security
income pursuant to Title XVI of the Social Security Act, 42
U.S.C. § 1381 et seq.  In support of his motion for judgment on
the pleadings, Osorio advances two arguments.  First, Osorio
maintains that the Administrative Law Judge ("ALJ") who presided
over his hearing failed to address properly Osorio's complaints
of fatigue and weakness by making an inadequate credibility
determination and not developing the record further.  Second,

Osorio argues that he did not knowingly and voluntarily waive his right to counsel at his hearing before the ALJ. The Commissioner also moves for judgment on the pleadings. For the reasons that follow, Osorio's arguments are rejected and the Commissioner's motion is granted.

## Background

A. Social and Medical History

The following facts are drawn from the administrative record. Mario Osorio was born October 30, 1977. He is 28 years old, has a ninth-grade education, speaks English fluently, and has never maintained gainful employment. Osorio was first diagnosed with multiple sclerosis ("MS") in 1999 while incarcerated in state prison.

Shortly after his release from prison, Osorio sought treatment at the emergency room of Mt. Sinai Medical Center on June 29, 2001. Osorio reported that he had been receiving weekly injections of Avonex as treatment for his MS while he was in prison, and had come to the emergency room for his next injection because he did not have insurance or other means to pursue treatment. When examined, Osorio's muscle strength was normal, his gait was steady and his balance was intact.

Osorio returned to the Mt. Sinai emergency room on July 2, 2001 to receive his next Avonex injection. Emergency room records indicate that he was ambulatory and that he presented no complaints aside from his request for medication. A neurological

consultation was performed that day.  Osorio was again alert and
oriented, his speech was fluent, and his muscle strength was
rated a 5 out of 5.  His coordination was intact and his gait
normal.  A sensory examination was intact to soft touch and
vibration, although the notes indicate a mild difficulty with
something that is impossible to read.  Osorio was advised to
continue with Avonex and was referred to the neurology clinic for
a follow-up.

From September 2001 to June 2002, Osorio was seen four times
at Mt. Sinai Hospital.  On September 4, an MRI showed multiple
discrete areas of T2/flair hyperintensity in the periventricular/
pericollosal white matter that are consistent with
demyelination.[1]  No other abnormalities were noted.  An MRI of
the spine conducted the next day was normal.  On October 18,
2001, Osorio was examined by a clinician who noted normal
coordination, sensation, gait, and muscle tone and power.  The
only detectable deficit at that time was a left gaze nystagmus.[2]
The clinician's assessment was that Osorio presented with "MS in
remission on Avonex."

---

[1] MS is characterized by the progressive deterioration of
the myelin sheaths (demyelination) that surround nerve fibers.
Damage to the myelin sheaths interferes with the conduction of
electrical signals through the fibers, which in turn causes the
symptoms of MS.  See, e.g., Medline Plus Medical Encyclopedia,
Multiple Sclerosis, http://www.nlm.nih.gov/medlineplus/ency/
article/000737.htm.

[2] "Nystagmus refers to rapid involuntary movements of the
eyes that may be from side to side (horizontal nystagmus), up and
down (vertical nystagmus) or rotary."  Medline Plus Medical
Encyclopedia, Eye movements -- uncontrollable, http://www.
nlm.nih.gov/medlineplus/ency/article/003037.htm.

On February 14, 2002, Osorio returned to Mt. Sinai with complaints of lightheadedness upon getting up in the morning and leg spasms. He reported that he had been experiencing the lightheadedness for the past month and the leg spasms for a week. His MS symptoms were described in the treatment notes as well controlled. The notes further indicate that Osorio was alert and oriented, with no observed mental deficits. His motor strength was 5 out of 5, his reflexes were "brisk," and no muscle weakness or paresis was noted. The only deficit noted was a horizontal nystagmus. The lightheadedness was attributed to rapid postural change and low fluid intake. Osorio was encouraged to take in more fluids and change positions slowly. He was prescribed a muscle relaxant (Baclofen) for the leg spasms.

Osorio complained again of dizziness in his next visit on June 13, 2002. The treatment notes indicate that this symptom began in summer 2001. The assessment made at the time was that Osorio was experiencing orthostatic hypotension, and was again encouraged to increase fluid intake.[3]

On July 23, 2002,[4] Osorio sought treatment at the Hospital

---

[3] See MedLine Plus Medical Encyclopedia, Blood pressure -- low, http://www.nlm.nih.gov/medlineplus/ency/article/003083.htm (defining orthostatic hypotension as "low blood pressure . . . brought on by a sudden change in body position, usually when shifting from lying down to standing upright").

[4] The ALJ appears to describe this visit as occurring in "March 2002." The record is clear as to the date of the visit, and while both parties discuss a July 23 visit in their treatment chronologies, neither mentions a visit in March.

for Joint Diseases.[5]  He complained of pain in his calves, dizziness, and that his legs had been getting weaker over the past six months.  The doctor's assessment was RRMS (relapsing remitting multiple sclerosis) with ataxia and paraparesis.[6]  The notes indicate an uncertainty as to a behavioral or cognitive component.  He was advised to continue taking Avonex.  There are no records of a subsequent visit to this hospital.

From November 2002 to July 2003, Osorio was incarcerated again and received all of his medical treatment through the New York Department of Correctional Services.  On November 14, 2002, Osorio was given a medical screening.  His history of MS was noted, and a prescription for Avonex renewed (a note indicates that he had been taking Avonex for "relief of symptoms").  A neurological exam was unremarkable, but Osorio was permanently assigned to a bottom bunk due to his condition.  Several days later, on November 25, Osorio complained of lightheadedness.

_____

[5] Osorio had previously visited the Orthopedic Institute of the Hospital for Joint Diseases for an echocardiogram on January 9, 2002.  It is not clear from the record whether this visit had anything to do with his MS; in any event, the results were normal.

[6] See Medline Plus Medical Dictionary, http://www.nlm.nih.gov/medlineplus/mplusdictionary.html (defining ataxia as "an inability to coordinate voluntary muscular movements that is symptomatic of some nervous disorders"); id. (defining paraparesis as "partial paralysis affecting the lower limbs").  The National Multiple Sclerosis Society describes relapsing remitting MS as characterized by "clearly defined flare-ups (also called relapses, attacks, or exacerbations).  These are episodes of acute worsening of neurologic function.  They are followed by partial or complete recovery periods (remissions) free of disease progression."  National MS Society, What is MS? http://www.nationalmssociety.org/What%20is%20MS.asp.

There is mention of some other problem, but it is impossible to make out from the notes (petitioner's counsel suggests it might be "ambulation" or "medication"). Osorio's medical records do not reveal any other MS-related complaint until March of 2003, with the possible exception of an episode of constipation in January.

On March 24, Osorio complained that he had been experiencing a "heat feeling," tightness and tingling on the bottom of his feet for the past three weeks. He repeated this complaint the next day and was referred for a neurological examination.[7] On April 16, Osorio complained of burning in his lower back and thighs occurring mostly at night. He was told to advise the prison if he was having any problems walking. Two days later, on April 18, Osorio reported some tightening of his right leg and occasional unsteadiness of gait. He was offered a cane but declined to take it, stating that he did not feel he needed any assistance walking.[8]

On April 24, 2003, Osorio had a neurological consult with Dr. Margaret Paroski.[9] He provided the doctor with a history of

_____

[7] The ALJ's report mentions only the March 25 complaint, but there are clearly two separate entries in the records turned over by the Department of Correctional Services.

[8] The ALJ lists the dates for the April 16 and 18 complaints as April 26 and 28. It is unclear why.

[9] This visit is described as occurring on April 25 in the ALJ's opinion. The confusion may be due to the fact that the consultation notes indicate that the referral was made on March 25. The treatment notes are clear, however, that the appointment took place on April 24.

the development of his illness, describing symptoms he had experienced since his diagnosis. The notes indicate that Osorio reported a recurrence of symptoms in 2000 that was completely resolved several weeks later. The next event in the chronology was the flare-up of symptoms he was then experiencing, which had begun in March 2003. He complained of weakness in his legs, a burning sensation in his legs that had spread to his hips and back, and increased urinary frequency. He denied any incontinence. He also mentioned a feeling of tightness in his fingertips and occasional blurry spots in his vision. Dr. Paroski found Osorio alert and fluent in speech. Examination revealed mild ataxia on tandem gait and mild dystaxia on heel-knee-shin testing, but his gait was steady and his muscle strength was rated 5 out of 5. Osorio also had diminished sensation in both clavicular areas. The doctor's conclusion was a recent exacerbation in multiple sclerosis that included increased knee jerks, decreased sensation to vibration and mild dystaxia in the lower extremities. She advised Osorio to continue with Avonex and recommended another MRI.

On May 3, 2003, Osorio completed an MRI screening form. He reported that his legs had been getting weaker and that he had tingling, pain and tightness in his legs. On a checklist of symptoms, Osorio marked off difficulty walking, visual problems, speech problems, dizziness, numbness, burning, difficult bending, pain/difficulty straightening, painful motion, sudden weight loss, bowel difficulties, bladder difficulties, and frequent

urination.  The MRI report noted extensive areas of increased T2
signal in periventricular distribution and involving the
undersurface of the corpus callosum.  The findings were
diagnostic of MS.  Other than a complaint of constipation in
July, Osorio's records do not indicate any other complaints of MS
symptoms for the remainder of his incarceration.

Beginning in September, Osorio sought treatment at the
Metropolitan Hospital Care Center.  On September 16, 2003, he
complained of bilateral arm weakness, weakness in his left leg
over the past six months, and pain in his right calf over the
last eight months.  Osorio also reported having blurry vision for
two months and neck and low back pain.  On examination, the
doctor graded muscle strength a 4 out of 5 and noted diminished
sensation in the left leg.  The doctor concluded the left leg
weakness was secondary to MS and that there were no signs of an
acute flair.  He recommended that Osorio resume Avonex, which he
had apparently stopped taking two months earlier.

Dr. Henderson, the same doctor who had seen Osorio in
September, completed a medical report on November 25, 2003.  The
report explains that Osorio visited the hospital on November 21
complaining of an ataxic gait, bilateral leg numbness, and left
leg weakness.  Dr. Henderson reports findings of left leg
weakness (strength rated 4 out of 5), ataxia to the left, and an
inability to perform a finger-to-nose test.  The diagnosis is
listed as multiple sclerosis a recent exacerbation, dated to
November 21, 2003.  Hospitalization was recommended at that time,

but Osorio refused.

The report includes several standard questions relating to the patient's ability to work.  In response to questions asking if the patient's medical condition has lasted or could be expected to last at least twelve months, and if the patient's impairments limited his ability to do basic work activities, Dr. Henderson answered yes.  He noted that excessive work activities "at present" could cause the patient pain, but indicated that the patient did not have to lie down during the day and that the patient's medications did not have side effects or limit the patient's activities.  The reports suggests severe limits on the amount that Osorio could lift and carry, and similar limits on physical movements and repetitive actions, but Dr. Henderson failed to answer questions about how much Osorio would be able to sit, stand or walk in a given work day.  Finally, the report indicates Henderson's opinion that Osorio could travel alone by bus on a daily basis but recommends that no work activities be undertaken until his condition improves.

B. Procedural History

On August 24, 2001, Osorio applied for supplemental security income.[10]  At some point, the Social Security Administration ("SSA") denied Osorio's claim, although the record is silent as

---

[10] The period in which Osorio claims disability benefits runs from August 24, 2001 through January 16, 2004 (the date of the ALJ hearing).  Osorio does not dispute, however, the Commissioner's contention that SSI benefits are not available for the period during which he was incarcerated.

to when this occurred.  On December 28, 2001, Osorio requested a hearing before an ALJ to contest this unfavorable decision, and on February 19, 2002, the SSA sent Osorio information regarding the ALJ hearing process.  The letter included a section entitled "Your Right to Representation" that read as follows:

> You may choose to be represented by a lawyer or other person.  A representative can help you get evidence, prepare for the hearing, and present your case at the hearing.  If you decide to have a representative, you should find one immediately so that he or she can start preparing your case.
>
> Some private lawyers charge a fee only if you receive benefits.  Some organizations may be able to represent you free of charge.  Your representative may not charge or receive any fee unless we approve it.
>
> We have enclosed the leaflet entitled "Social Security and Your Right to Representation."  We are also enclosing a list of groups that can help you find a representative.

Letter from Kenneth G. Levin, Administrative Law Judge, to Mario E. Osorio (Feb. 19, 2002).

On August 13, 2002, the SSA sent Osorio a notice that his hearing date was set for September 25, 2002.  The ALJ reminded Osorio, "If you want to have a representative, please get one right away."  Also included was an Acknowledgment of Receipt of the Notice of Hearing, on which Osorio was to indicate whether he would or would not be present at the hearing, and sign and send it back to the SSA.  On the same date, the SSA sent letters to Mr. Mark Ramnauth requiring him to give testimony as a vocational expert at the hearing, and to Dr. Brian Anziska requesting him to give testimony as a medical expert at the hearing.

Osorio's hearing was rescheduled several times, and finally

held on November 26, 2003.  Osorio appeared <u>pro se</u> and testified.

Vocational expert Edna Clark and medical expert Dr. Brian Anziska

also appeared and testified.  On January 16, 2004, the ALJ issued

an opinion denying Osorio's disability claim.  On February 9,

2004, Osorio requested review of the ALJ's decision by the

Appeals Council.  The Appeals Council denied review on April 15,

2004, making the ALJ's decision to deny benefits the final

administrative decision on Osorio's application.  Osorio then

filed an initial complaint challenging refusal of benefits in

this Court on June 29, 2004, and an amended complaint on November

7, 2005.[11]


## <u>Discussion</u>

In reviewing the Commissioner's decision, a federal district

court may set aside a determination of the ALJ only if it is

based upon legal error or is not supported by substantial

evidence.  <u>Rosa v. Callahan</u>, 168 F.3d 72, 77 (2d Cir. 1999).[12]

---

[11] The Court instructed Osorio to file an amended complaint
to explain why he was 11 days late in filing his original
complaint.  In his amended complaint, he explained that he filed
late because during part of April and May 2004 he was bedridden
due to an exacerbation of MS, which he experienced because his
Medicaid coverage was terminated and he could not receive his
Avonex treatments.

[12] "Since the standards for determination of disability and
for judicial review in cases under 42 U.S.C. § 423 [Title II] and
42 U.S.C. § 1382c(a)(3) [Title XVI] are identical, decisions
under these sections are cited interchangeably."  <u>Donato v. Sec'y
of Dep't of Health and Human Servs.</u>, 721 F.2d 414, 418 n.3 (2d
Cir. 1983); <u>see also</u> <u>Barnhart v. Thomas</u>, 540 U.S. 20, 24 (2003)
(noting that the Court's Title II analysis applied equally to
Title XVI); <u>Sullivan v. Zebley</u>, 493 U.S. 521, 525 n.3 (1990)

"Substantial evidence" is "more than a mere scintilla[; it] is such relevant evidence as [a] reasonable mind might accept as adequate to support a conclusion." Jasinski v. Barnhart, 341 F.3d 182, 184 (2d Cir. 2003) (citation omitted).  Furthermore, the findings of the Commissioner as to any fact, if supported by substantial evidence, are conclusive.  Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995) (citation omitted).

A claimant is disabled under Title XVI of the Social Security Act if she demonstrates that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than twelve months" and the impairment must be of "such severity that he is not only unable to do his previous work but cannot . . . engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 1382c(a)(3)(A), 1382c(a)(3)(B); Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998).  The claimant must show proof of the impairment through "medically acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. § 1382c(a)(3)(D), and in determining whether the impairment is so severe as to prohibit any substantial gainful work in the national economy, the Commissioner examines the claimant's age, education, and work history.  Id. § 1382c(a)(3)(B).

———————————

(describing the regulations that implement the two Titles as "the same in all relevant respects").

The Social Security regulations outline a five-step process the Commissioner must follow when making a disability determination.

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him disabled without considering vocational factors such as age, education, and work experience. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work. Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999) (citation omitted); see also 20 C.F.R. § 416.920. The claimant bears the burden of proof for the first four steps, while the Commissioner bears the burden of proof for the final step. Shaw v. Chater, 221 F.3d 126, 132 (2d Cir. 2000).

Allocation of proof notwithstanding, the ALJ has a duty to "affirmatively develop the record." Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (citation omitted). This duty arises from the Commissioner's regulatory obligation to develop a complete medical record before making a determination of disability. Id. (citing 20 C.F.R. § 404.1512(d)-(f)); see also 20 C.F.R. § 416.912(d)-(f) (Title XVI claims). The duty is heightened, moreover, when a claimant is unrepresented. See Robinson v.

Sec'y of Health and Human Servs., 733 F.2d 255, 258 (2d Cir. 1984) (noting the ALJ's "duty to scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" (citation omitted)).

## A. Osorio's Complaints of Fatigue and Weakness

Osorio's challenge to the substance of the ALJ's decision is quite narrow. He does not appear to take issue with the ALJ's findings in the first four steps of the sequential evaluation.[13] Rather, Osorio argues that the ALJ erred by failing to consider properly Osorio's complaints of fatigue and side effects of his medication. This failure, the argument goes, resulted in a misapprehension of Osorio's residual functional capacity in step five when the ALJ concluded that Osorio "ha[d] residual functional capacity to perform a significant range of sedentary work." See 20 C.F.R. § 416.920(a)(4)(v) ("At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if

---

[13] The ALJ made specific findings related to all five steps of the disability determination. First, the ALJ found that Osorio had not engaged in substantial gainful employment during the alleged period of disability. Second, the ALJ found that Osorio suffered from multiple sclerosis and that his impairment was severe. Third, while the ALJ conceded that Osorio's impairment might rise to the level of the Listings at times (including at the time of the hearing), he found that it had not lasted at that level for the required durational period. Fourth, the ALJ recognized that Osorio had no past relevant work. And fifth, the ALJ found, based on the undisputed testimony of a vocational expert, that there were a significant number of jobs in the national economy that could accommodate Osorio's residual functioning capacity to perform sedentary work.

you can make an adjustment to other work.").

Social Security regulations require an adjudicator to determine the extent to which a claimant's symptoms affect the claimant's functional capacity. <u>See</u> Id. § 416.929(c)(3); <u>see also</u> Evaluations of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, Social Security Ruling 96-7p, 61 Fed. Reg. 34,383, 34,484 (July 2, 1996) ("SSR 96-7p") ("[T]he intensity, persistence, and functionally limiting effects of the symptoms must be evaluated to determine the extent to which the symptoms affect the individual's ability to do basic work activities."). An ALJ must "carefully consider the individual's statements about symptoms" along with all of the other evidence in the case record, and must make findings about the credibility of the claimant's statements. SSR 96-7p, 61 Fed. Reg. at 34,484.[14] Conclusory findings of a lack of credibility will not suffice; rather, an ALJ's decision "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." <u>Id.</u>

A finding of credibility made by an ALJ is entitled to

---

[14] <u>See also</u> 20 C.F.R. § 416.929(c)(4) ("Your symptoms, including pain, will be determined to diminish your capacity for basic work activities . . . to the extent that your alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence.").

deference by a reviewing court.  As with any finding of fact,
"[i]f the Secretary's findings are supported by substantial
evidence, the court must uphold the ALJ's decision to discount a
claimant's subjective complaints."  Aponte v. Sec'y of Health and
Human Servs., 728 F.2d 588, 591 (2d Cir. 1984).  Thus, a
determination of credibility will only be set aside if it is not
set forth "with sufficient specificity to enable [a reviewing
court] to decide whether [it] is supported by substantial
evidence."  Ferraris v. Heckler, 728 F.2d 582, 587; see also SSR
96-7, 61 Fed. Reg. at 34,486 (same).

During the hearing before the ALJ, Osorio testified about
his fatigue.  He stated, in response to a question from the
testifying medical expert, that he was tired "every day" and that
he "can't . . . function a long, long time without getting . . .
weak."  Osorio further explained that he sleeps until noon and
goes to bed around 10:00 pm.  Osorio was asked several times
during the hearing what symptoms or problems he was having, and
more specifically about what Avonex did to him, but Osorio failed
to mention any problems relating to side effects from the
medication.  He did, however, state in his disability report that
he "get[s] weak when taking" Avonex.

The ALJ stated in his findings that "claimant's allegations
regarding his limitations are not totally credible for the
reasons set forth in the body of the decision."  The body of the
decision provides several reasons to support this finding.
First, the ALJ pointed to Osorio's testimony that he had been

16

looking for work as a custodian as recently as September 2003.
The ALJ stated that it "ma[de] no sense . . . that he would have
been seeking such work if he did not feel he would be capable of
doing it."  He further noted that Osorio had not used any
ambulatory device until very recently, that he is able to travel
by bus, that he admitted no restriction on his ability to sit,
and that he engaged in several social activities, including going
to movies, going to church, and socializing with friends and
family.  More generally, the ALJ noted elsewhere that he was
unable to get clear answers from Osorio during questioning and
that his responses during the hearing seemed inconsistent.  The
ALJ gave specific examples of such inconsistencies in Osorio's
testimony about this symptoms and the amount he sleeps.  Finally,
the ALJ noted several periods of time when Osorio did not seek
treatment, as well as Osorio's failure to seek mental health
treatment despite his complaint that his mind was "not there."

     While perhaps not as explicit and organized as it might have
been, the ALJ's decision does "contain specific reasons for the
finding on credibility, supported by the evidence in the case
record."  SSR 96-7p, 61 Fed. Reg. at 34,486.  The ALJ placed
strong emphasis on Osorio's lack of consistency, relative to his
own statements at the hearing and other information in the case
record.  Lack of consistency is a strong indication of lack of
credibility.  See id.  The ALJ also compared Osorio's claim of
fatigue with other information from the record, especially
Osorio's statements regarding his search for employment as a

custodian, his account of his daily activities, and the frequency of his attempts to seek treatment. The ALJ's opinion makes clear the minimal weight he gave to Osorio's statements and the reasons for that weight. See id. Furthermore, the reasons given by the ALJ to support his credibility determination were legitimate factors in evaluating the credibility of Osorio's complaints and all were supported by substantial evidence in the record.

Osorio's argument that the ALJ failed to sufficiently inquire or assess Osorio's complaint regarding the negative side effects of Avonex also fails to persuade. The ALJ asked repeatedly at the hearing for Osorio to describe the symptoms and problems he was having relating to his MS. The ALJ specifically inquired into what effects the Avonex had on him. And the ALJ asked Osorio why he wouldn't be able to perform a sedentary job. At no point in the hearing did Osorio mention negative side effects of Avonex. Indeed, the only reasons Osorio gave for not being able to perform sedentary work were a lack of experience and the fact that he ruminates about his condition (a phenomenon which, the ALJ noted, Osorio never attempted to address through mental health treatment). These repeated inquiries satisfied the ALJ's duty to develop a record as to Osorio's symptoms. The ALJ might have been a more precise questioner, but a breach of this duty cannot be demonstrated, as Osorio attempts to do, by contrasting a claimant's failure to volunteer information in response to repeated direct questioning with material included in an affidavit submitted to a reviewing court over a year later.

This is especially true when the ALJ has already obtained all of the patient's medical records and other relevant documents.

B. Waiver of the Right to Representation

A claimant of disability benefits "is entitled to be represented by counsel" in a hearing before an ALJ, and "the ALJ must ensure that the claimant is aware of this right." Robinson, 733 F.2d 255 at 257. To this end, there is a statutory requirement that the Commissioner of Social Security

> notify each claimant in writing, together with the notice to such claimant of an adverse determination, of the options for obtaining attorneys to represent individuals in presenting their cases before the Commissioner of Social Security. Such notification shall also advise the claimant of the availability to qualifying claimants of legal services organizations which provide legal services free of charge.

42 U.S.C. § 1383(d)(2)(B). Once a claimant has been adequately notified of the right to proceed with a representative, a claimant may waive that right.

The ALJ notified Osorio of his right to representation in the letter dated February 19, 2002, which is excerpted above. It informs Osorio of his ability to be represented by a lawyer or other person at the hearing, and explains that there are organizations that might represent him for free, and that there are lawyers who would charge him only if he received benefits. The letter goes beyond the statutory notice requirement to set out the benefits of having an attorney, specifically, to assist with the gathering of evidence, the preparation for the hearing, and the presentation of the claimant's case. It further explains

that a representative may not charge or receive a fee unless it is approved by the SSA. This letter clearly satisfies the statutory requirement. See Johnson v. Barnhart, No. 03 Civ. 4606 (PKC), 2006 WL 1063195, at *8 (S.D.N.Y. Apr. 20, 2006) (concluding that this same language complied with the statute).[15]

Moreover, the letter references an enclosed leaflet entitled "Social Security and Your Right to Representation" as well as an enclosed list of groups that could help Osorio find representation. Osorio argues that there is no way to know if these were in fact sent to him, but he does not assert that he did not receive them. Yet, even if he did not receive the leaflet, Osorio was nonetheless notified that such a reference existed, and he easily could have contacted the SSA or ALJ to request a copy, or even downloaded a copy from the SSA's website. See http://www.ssa.gov/pubs/10075.pdf. Finally, Osorio was twice reminded of his opportunity to be represented at the hearing in later notices of hearing, dated August 13 and October 22, 2002.

---

[15] The letter also appears to meet the requirements of the Fifth, Seventh, and Eleventh Circuits that the "notification should at least contain: (1) an explanation of the benefits of having an attorney to aid in the proceedings; (2) notification of the possibility of seeking free counsel or a contingency arrangement; and (3) notification regarding the . . . fee approval process generally." Frank v. Chater, 924 F. Supp. 416, 423 (E.D.N.Y. 1996) (citing Binion v. Shalala, 13 F.3d 243, 245 (7th Cir. 1994); Edwards v. Sullivan, 937 F.2d 580, 585 (11th Cir. 1991); Thompson v. Sullivan, 933 F.2d 581, 584 (7th Cir. 1991); Smith v. Schweiker, 677 F.2d 826, 828-29 (11th Cir. 1982); and Clark v. Schweiker, 652 F.2d 399, 403 (5th Cir. Unit B July 1981)). These requirements have been adopted by a district court in this Circuit, but are not followed in this district. See Johnson, 2006 WL 1063195, at *8 (observing that "courts in this District have not adopted the Frank formulation").

The Second Circuit has held that, beyond initial notification, an ALJ must ensure that a claimant is aware of the right to representation before a waiver is accepted.  See Robinson, 733 F.2d at 257.  At Osorio's hearing, the ALJ confirmed that Osorio had received the letter informing him of his right to representation, verified that Osorio did not bring a representative to the hearing, and asked Osorio if he wished to represent himself.[16]  The ALJ satisfied his duty to ensure that Osorio was aware of his right to representation, and thus informed, Osorio's subsequent waiver of counsel was knowing and voluntary.

Osorio argues that this dialogue was insufficient, relying on Rocker v. Apfel, No. 98 Civ. 9040 (WHP), 2000 WL 1459846 (S.D.N.Y. Sept. 29, 2000).  The defect identified by the court in Rocker, however, was that the claimant never received notice of her right to representation.  See id., 2000 WL 1459846, at *7. While the court held that the ALJ's questions at the hearing were

---

[16] The dialogue went as follows:
ALJ: Sometime considerably in the past when you asked for this hearing we sent you a letter telling you that if you wanted to bring a lawyer or a non lawyer representative you could do so. Did you receive that?

CLMT: Yes.

ALJ: And I think you don't have a representative.  Is that correct?

CLMT: No.

ALJ: So do you wish to represent yourself today?

CLMT: Yeah, basically, yeah, right now, yes.

insufficient to cure the defective written notification, <u>id.</u>, the court did not have cause to consider whether these questions could have secured a knowing waiver from a claimant who had been properly notified. The ALJ certainly could have, as Osorio suggests, inquired further into Osorio's decision to represent himself and even invited Osorio to request an adjournment, but these steps are not necessary to ensure that an already adequately notified claimant is aware of his right and any waiver thereof is made knowingly.[17]

Even assuming, however, that Osorio's waiver of his right to representation were deficient, remand would be proper only if Osorio has been prejudiced by his lack of counsel. <u>See, e.g.</u>, <u>Evangelista v. Sec'y of Health and Human Servs.</u>, 826 F.2d 136, 142 (1st Cir. 1987); <u>Rocker</u>, 2000 WL 1459846, at *6. Osorio has made no showing of prejudice. As noted above, the ALJ fulfilled his heightened duty to develop the record. This duty does not depend on the effectiveness of waiver of representation. Indeed, "the higher standard adopted by other courts in the case of ineffective waiver is already encompassed by this Circuit's imposition of a heightened duty on an ALJ in <u>pro se</u> cases generally: for remand, the claimant must demonstrate that the ALJ failed to scrupulously and conscientiously probe into, inquire

_____

[17] Quite a different situation would be presented if, having been properly notified of his right, Osorio requested an adjournment himself in order to secure representation. <u>See</u> <u>Leach ex rel. Murray v. Barnhart</u>, No. 02 Civ. 3561 (RWS), 2004 WL 99935, at *6 (S.D.N.Y. Jan. 22, 2004).

of, and explore for all the relevant facts." <u>Frank v. Chater</u>, 924 F. Supp. 416, 427 (E.D.N.Y. 1996); <u>see also</u> <u>Leach ex rel.</u> <u>Murray v. Barnhart</u>, No. 02 Civ. 3561 (RWS), 2004 WL 99935, at *7 (S.D.N.Y. Jan. 22, 2004) (same). Because Osorio has not made any such showing, he has failed to establish that he was prejudiced by his lack of representation.

## Conclusion

For the reasons described above, Osorio's motion for judgment on the pleadings is denied. The Commissioner's motion to affirm the determination is granted. The Clerk of Court shall close the case.

SO ORDERED:

Dated:    New York, New York
          May 30, 2006

_____
DENISE COTE
United States District Judge